NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALBERT MAXSON,

    Plaintiff,

         v.

YRC INC. d/b/a YRC FREIGHT,

    Defendants.

Civil Action No. 14-4653 (PJS) (TJB)

OPINION

SHERIDAN, District Judge.

This matter comes before the Court on a motion to dismiss brought by YRC Inc. d/b/a YRC Freight, LLC ("Defendant" or "YRC"), pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff, Albert Maxson ("Plaintiff" or "Maxson"), opposes this matter. The Court decides these matters without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants in part and denies in part Defendant's motion.

I.    <u>Background</u>[1]

Plaintiff is a fifty-six (56) year old man, who has worked as a truck driver for YRC since approximately 1984. During his over thirty years of employment with YRC, Plaintiff has been recognized generally for his hard work and dedication, and has specifically been recognized with YRC's award for Driver of the Year.

Plaintiff alleges that, "[i]n or about June 2012, Defendant YRC falsely accused Plaintiff Maxson of theft of services, which caused him to be wrongfully detained and arrested on June 12,

---

[1] The following allegations are taken from the Amended Complaint and must be taken as true in deciding this Motion to Dismiss. *See Newman v. Beard*, 617 F.3d 775, 779 (3d Cir. 2010) ("We accept all factual allegations as true, construe the amended complaint in the light most favorable to [the plaintiff], and determine whether, under any reasonable reading of the amended complaint, he may be entitled to relief.").

2012." Am. Compl. ¶5. According to the Complaint, "Plaintiff was charged with violating [N.J.S.A. 2C:20-8(b)] (Theft of Services)," based solely on the allegations of YRC's Director of Security, who made false accusations about Plaintiff to the Marlboro Township Police. *Id.* Plaintiff further alleges that "YRC created and gave [Maxson] a false delivery manifest which sent him to the municipal complex in Marlboro, New Jersey purportedly for a pick-up of merchandise." *Id.* ¶10. "The destination/pick-up manifest was in reality a hoax orchestrated by [YRC's] Security Officer," who was waiting for Maxson with the police when Maxson arrived at the municipal facility. *Id.* YRC's Security Officer then took Plaintiff's truck, keys, and company radio, which isolated Maxson so that he could be taken into custody by the police. *Id.* Plaintiff claims that he "was improperly detained, not free to leave, and questioned" about YRC's allegations of theft—allegations that Plaintiff asserts were false. *Id.* Although Maxson denied any involvement in criminal activity, YRC's false allegations against him ultimately led to the aforementioned criminal charges being filed against him. *Id.* On December 4, 2012, the New Jersey Superior Court dismissed all charges against Plaintiff. *Id.*

As a result of his arrest, Maxson was terminated from his employment at YRC, without pay. *Id.* ¶6. Maxson complained to YRC "that his arrest was improper, that the charge of theft was baseless, and that he, and other truck drivers at YRC, were routinely asked by YRC's customer to merely remove unwanted pallets from their customers' property for disposal." *Id.* Maxson was not reinstated to his employment position until after the Superior Court dismissed the charge against him, and when he was reinstated, it was without back pay. *Id.* ¶7.

Plaintiff asserts that YRC made false statements about Plaintiff to his co-workers, in particular "that Plaintiff had reported to the [p]olice that it was a routine practice for YRC truck drivers to remove unwanted pallets from customers and sell them during business hours." *Id.* ¶8.

Such statements led the other YRC employees to consider Plaintiff to be "a rat." *Id.* ¶8. Moreover, Plaintiff asserts that a video recording of his June 11, 2012, interview with the police was circulated to his co-workers, which subjected Plaintiff to further criticism and harassment at work.

Thereafter, "Plaintiff was threatened at work, called a 'rat[,]' and harassed at work by supervisors and co-workers who put him in fear for his personal safety virtually on a daily basis." *Id.* ¶9. In the Amended Complaint, Plaintiff describes several exemplary incidences. "On April 16, 2013, Plaintiff was called a 'rat scumbag' at a meeting with his Shop Steward and Assistant Shop Steward." *Id.* ¶11. In reference to the criminal investigation, the Shop Steward and Assistant Shop Steward said, "We don't care about you being driver of the year and all that bullshit," and "we saw the [police] tape." *Id.* ¶11 (alteration in original). Further, "[w]hile moving equipment from the Elizabeth Terminal to Trenton on May 4, 2013, Plaintiff's life was threatened, and he was told to 'get off my dock you [f-ing] rat scumbag.'" *Id.* ¶12. On that occasion, according to the Amended Complaint, "[t]he Shop Steward joined the confrontation and told Plaintiff to 'stop causing trouble, and get off the dock.'" *Id.* Although Plaintiff claims that YRC's Operations Manager was also present at the time of this incident and overheard the threats to Plaintiff, the manager did nothing to intervene or otherwise protect the Plaintiff from these threats. The Terminal Manager in Elizabeth learned about the threats to Plaintiff before Plaintiff returned from Trenton. Plaintiff alleges that, while "[t]he Terminal Manager told Plaintiff 'good luck' [in Trenton], neither he nor anyone else in YRC management took action to protect Plaintiff. *Id.* (second alteration in original).

Plaintiff's first day at the Trenton Terminal was May 20, 2013. The Terminal Manager in Trenton introduced Plaintiff to all the employees, and Plaintiff alleges that a Shop Steward then told the employees and the Terminal Manager that "there is one individual not to talk to, and to be careful of," and pointed to Plaintiff. *Id.* ¶13. Following that meeting, Plaintiff got his paperwork

for the day's assignments, and proceeded to his truck, where he found that his truck door handles had been greased and that his freight inside the trailer had been "double stacked." *Id.* ¶14. On May 24, 2013, Plaintiff was repeatedly referred to as a "rat scumbag" in front of all of YRC's employees. He was told that if he came to work on Saturday, May 25, 2013, there would be "no supervisor," which Plaintiff alleges meant that he would be physically hurt while there would be no witnesses around. *Id.* ¶15.

When Plaintiff arrived to work on Monday, June 17, 2013, he found the freight contents of his trailer thrown about the truck, with pallets stripped of merchandise, and the truck contents wrecked. Plaintiff then notified management, and alleges he and his Terminal Manager watched as the freight was thrown again from one truck to another by the employees. The Terminal Manager did not say anything to the employees throwing the freight, and specifically never instructed them to stop, which Plaintiff alleges made the environment worse. When Plaintiff got a forklift to straighten the pallets, he was physically rammed by a forklift operated by another employee. Plaintiff was mocked and called derogatory names, including certain names regarding sexual orientation, and other employees told him that they would "kick [his] ass." *Id.* ¶17. Plaintiff alleges that other threats were made to "get" him at night when he was home. *Id.*

Throughout June 2013, Plaintiff continued to be threatened at work, and was repeatedly called "rat scumbag," "jerk-off," and "homo," among others. *Id.* ¶18. It became routine "for Plaintiff to find that his truck ha[d] trash in it, that the door handles and pallet jack were greased, and that the freight was thrown about on the floor." *Id.* Plaintiff alleges that he asked for help from YRC supervisors/dispatchers to stop the threats, but was given no help.

In July and August 2013, Plaintiff was challenged to a fight by a younger co-worker. "On two such occasions, the Assistant Shop Steward repeatedly screamed at Plaintiff and threated to hit

him" because Plaintiff "said 'hello' to an employee with whom Plaintiff had a good working relationship with at another terminal." *Id.* ¶19.

Plaintiff alleges that the threats to his "life and safety accelerated to the point that YRC's employees have [told] him that . . . they will 'kick his ass,' and 'knock [him] out'" if they catch him outside of work. *Id.* ¶21. Plaintiff alleges that, despite asking YRC supervisors for help, the YRC supervisors did nothing to help correct the work environment; "[i]nstead, Plaintiff was told routinely by supervisors 'I can't talk about it.'" *Id.*

This type of environment caused Plaintiff to suffer from stress, anxiety, and recurring nightmares. "Plaintiff was eventually hospitalized for a heart attack[,] . . . required stomach surgery, and suffered other medical and psychological problems that he alleges were caused by the work environment created by YRC." *Id.* ¶9. Plaintiff remains under the care of medical professionals. *Id.*

On or about June 10, 2014, Plaintiff commenced this action against YRC in the Superior Court of New Jersey, Monmouth County. On July 23, 2014, Plaintiff served upon YRC's counsel a copy of the Amended Complaint, wherein Plaintiff corrected an error with regards to YRC's name. In his Amended Complaint, Plaintiff alleges that "the misconduct of . . . YRC and its agents and employees made Plaintiff a victim of severe and pervasive harassment," and that YRC discriminated against Plaintiff because of his age by allowing the harassment and hostile work environment to continue, in a manner designed to force Plaintiff to resign. Am. Compl. ¶ 11. He asserts causes of action under the New Jersey Law Against Discrimination ("NJLAD"), infliction of emotional distress ("IIED"), breach of contract, and promissory estoppel. YRC removed the matter to this Court on July 24, 2014. By stipulation of the parties, Plaintiff's breach of contract claim was dismissed with prejudice on August 27, 2014.

## II.     Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). That is, "[t]he pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 (internal citations and quotations omitted). Moreover, although a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 678-79; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). Nevertheless, a complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000).

Additionally, while ordinarily nothing beyond the four corners of the complaint may be considered on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original)). Additionally, "a district court may examine an 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *Id.* (quoting *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "The rationale for these exceptions is that the primary problem raised by looking to documents outside the complaint – lack of notice to the plaintiff – is dissipated where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *Id.* (alteration in original) (internal quotation marks omitted).

### III. Discussion

Defendant YRC has now moved to dismiss Plaintiff's claims for intentional infliction of emotional distress (IIED) and promissory estoppel. The crux of Defendant's argument is that Plaintiff's common law claims are preempted by his NJDLAD claim, and must therefore be dismissed. Alternatively, Defendant asserts that Plaintiff has failed to otherwise state a claim for either IIED or promissory estoppel. The Court addresses these arguments below.

#### A. Plaintiff's IIED Claim

Under New Jersey law, "supplementary common law causes of action [are not permitted] when a statutory remedy under the [NJ]LAD exists." *Schneider v. Sumitomo Corp. of Am.*, No. 09-5094, 2010 U.S. Dist. LEXIS 59101, at *13 (D.N.J. June 14, 2010) (alterations in original) (internal

quotation marks and citations omitted). "Therefore, where the factual predicates for the common law claims and the NJLAD claims are the same and the remedies sought are the same, the common law claims are barred." *Id.* (internal quotation marks and citations omitted). The NJLAD, however, "does not necessarily bar all common law causes of action that might be implicated in an LAD action." *Mosley v. Bay Ship Mgmt., Inc.*, 174 F. Supp. 2d 192, 201 (D.N.J. 2000).

Admittedly, at first glance, Plaintiff's Complaint appears to be asserting discrimination and IIED claims that substantially overlap with his NJLAD claims. The Amended Complaint asserts the same factual allegations for Plaintiff's IIED claim as it does for Plaintiff's NJLAD claim. *See* Am. Compl. ¶ 32 (re-alleging the factual background in whole). The Amended Complaint also states, "[t]he misconduct of Defendant YRC and its agents and employees made Plaintiff a victim of severe and pervasive harassment, and Defendant YRC discriminated by allowing the harassment and hostile work environment to continue because of his age, and did so in a manner designed to force him to resign." Am. Compl. ¶ 11. The Amended Complaint further alleges, "[t]here was no lawful basis for Defendant to target Plaintiff for arrest and make him a victim of severe and pervasive harassment, or discriminate him based on his age." *Id.* at ¶ 26. Based on these statements, and the way Plaintiff alleged his IIED claim, Defendant argues that the IIED claim is based on the same underlying facts as the NJLAD claim for age discrimination, and must be dismissed. The Court disagrees.

Although the Amended Complaint is not entirely clear on this point, the Court understands the Amended Complaint to assert distinct claims, based on distinct wrongs. While the claims may overlap, Plaintiff's IIED claim is based on his alleged harassment he faced in the workplace, stemming from his (allegedly unwarranted) reputation as a "rat." There are no allegations that his co-workers, or relevant supervisors, were harassing him based on his age, distinguishing this case

from several of the cases that have found common law claims to be preempted because the claim was based on the same discriminatory conduct. *See, e.g., Everson v. JPMorgan Chase*, No. 12-07288, 2013 U.S. Dist. LEXIS 65309 (D.N.J. May 8, 2013) (finding IIED claim to be preempted when the basis of the claim was that the defendant had committed certain wrongs for discriminatory reasons, as opposed to the conduct itself being outrageous). In other words, in his IIED claim, Plaintiff is not seeking redress for conduct that is identical to that underlying his NJLAD claim—e.g., where his asserted causes of action are age discrimination under the NJLAD and an intentional infliction of emotional distress claim based on harassment suffered because of Plaintiff's age. *Compare Schneider*, 2010 U.S. Dist. LEXIS 59101, at *16 ("Accordingly, this case is unlike the cases in which a plaintiff seeks redress for conduct that is identical under two separate causes of action."), *and Kairawala v. GE Aviation*, No. 09-0398, 2009 U.S. Dist. LEXIS 57679, at *3, 8 (D.N.J. July 7, 2009) (finding that the plaintiff's IIED claim based on the defendant's termination of the plaintiff purportedly due to improper discrimination was preempted by the NJLAD), *with Gaines v. UPS*, No. 13-3709, 2014 U.S. Dist. LEXIS 51413, at *14–15 (D.N.J. Apr. 14, 2014) (explaining that IIED claim was preempted where it stemmed from the defendant's discriminatory conduct), *and Dimare v. Metlife Ins. Co.*, No. 07-4268, 2008 U.S. Dist. LEXIS 43093, at *11–12 (D.N.J. May 30, 2008) (finding that an IIED claim was preempted where the plaintiff sought "to be compensated for the same wrongs alleged in Count I of the complaint for violations under the NJLAD"). Rather, the crux of his IIED claim is the allegedly severe and pervasive harassment suffered by Plaintiff after a false rumor spread that Plaintiff had cooperated with the police concerning theft of services by YRC employees after he was wrongly arrested. Plaintiff's NJLAD claim, on the other hand, stems from allegations that management was trying to force him out of the company because of his age. These alleged actions begin with the incident where he was falsely

9

arrested and include Plaintiff's allegations that Defendant YRC ignored Plaintiff's complaints of harassment in the workplace because YRC wanted to force Plaintiff's resignation. At this stage, considering all inferences must be made in favor of Plaintiff, the Court finds that Plaintiff's claim for IIED is distinguishable from the substance of his NJLAD claim on the face of the Amended Complaint; accordingly, it is not preempted.

In its Reply Brief, Defendant YRC raises for the first time the argument the Amended Complaint lacks allegations that would support the imposition of liability on YRC. Even if the Court could consider this argument, *see Stern v. Halligan*, 158 F.3d 729, 731 n.3 (3d Cir. 1998) ("A party cannot raise issues for the first time in a reply brief."), the Court disagrees. Plaintiff has alleged that YRC is liable under a theory of *respondeat superior*,[2] and, contrary to Defendant's assertions, there are allegations in the Amended Complaint that support this theory.

Under New Jersey law, "an employer can be found liable for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting within the scope of his or her employment." *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003). Because New Jersey follows the Restatement (Second) of Agency, an employer is still liable for an employee's behavior if the employee is acting outside the scope of his or her employment in certain scenarios. *See Lehmann v. Toys 'R' Us*, 626 A.2d 445, 462 (N.J. 1993). For example, an employer will be liable "if the employer intended the conduct," meaning "an employer had actual knowledge of the harassment and did not promptly and effectively act to stop it." *Id.* at 463 (citing Restatement (Second) of Agency § 219(2)(a)). Here, Plaintiff has alleged that YRC either started or helped

---

[2] This theory of liability strengthens Plaintiff's argument that the IIED claim and the NJLAD claim do not stem from the same operative set of facts. Plaintiff's IIED claim is based on a theory of indirect liability, meaning that he is asserting that YRC is indirectly liable for the intentional infliction of emotion distress that Plaintiff suffered in the workplace due to the alleged harassment stemming from the rumor that YRC appears to have started or helped perpetuate. This stands in contrast to the direct liability YRC would face under the NJLAD for discriminating against Plaintiff based on his age.

amplify the rumor that Plaintiff was a "rat," allowing for an inference that YRC intended the harassment to occur. *See* Am. Compl. ¶8. Alternatively, "such conduct would also clearly qualify as negligence or recklessness [on the part of the employer], thus triggering liability under § 219(2)(b)" of the Restatement. *See Lehmann*, 626 A.2d at 463. Furthermore, the Amended Complaint contains allegations that Plaintiff's supervisors and managers were not only aware of the harassment of Plaintiff and refused to take any action to stop or otherwise prevent such conduct, but also were involved in the alleged harassment of Plaintiff. Therefore, assuming YRC's supervisors and managers were acting outside the scope of their employment, YRC could also be liable if, for example, it "delegate[d] the authority to control the work environment to a supervisor and the supervisor abuse[d] that delegated authority." *Id.* at 462 (citing to Restatement § 219(2)(a)). Determining whether a supervisor was aided in creating a hostile work environment by power delegated to him or her by the employer "requires a detailed fact-specific analysis," *id.*, and is, accordingly, beyond the scope of this motion. Rather, at this stage, Plaintiff has alleged sufficient facts that, if proved, would allow for liability to attach to YRC.

  Finally, the Court also finds that the Amended Complaint sufficiently alleges a plausible claim for IIED. A claim of intentional infliction of emotional distress requires a plaintiff to "establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988); *see also Taylor v. Metzger*, 706 A.2d 685, 694 (N.J. 1998). Plaintiff has alleged that, while he was an employee at YRC, he was wrongly accused of being a "rat," which led to his co-workers and supervisors continually threatening his life and safety, including physically ramming him with a forklift; constantly mocking him and calling him derogatory names including "rat scumbag," "jerk-off," "homo," "pussy," and fagot"; and vandalizing his truck and freight. Plaintiff has alleged that any

supervisors he asked for help from refused to help him. He also alleges that the YRC's conduct and actions were "outrageous," "willful," and "reckless." *See* Am. Compl. ¶ 33. As a proximate cause of Defendant's conduct, Plaintiff suffered "from stress, anxiety, and recurring nightmares," had a heart attack and underwent stomach surgery, and underwent and continues to use psychological counseling. Considering these allegations and the Amended Complaint as a whole, the Court can imagine a plausible set of facts which would demonstrate "extreme and outrageous conduct" on the part of YRC, which caused Plaintiff to suffer severe distress. *See Rivera v. Cracker Barrel Old Country Store, Inc.*, No. 02-4160, 2003 U.S. Dist. LEXIS 26838, at *16–17 (D.N.J. Mar. 3, 2003) (denying motion to dismiss a claim for IIED where the plaintiff alleged that he was "treated in a discriminatory manner" and "wrongly accused of excessive absences and poor job performance").

While YRC maintains that these alleged facts are insufficient to constitute intentional infliction of emotional distress under *Buckley* to survive a motion to dismiss under Rule 12(b)(6), the Court cannot agree. As courts in this District have noted, "rare is the dismissal of an intentional infliction of emotional distress claim on a motion to dismiss." *Rivera*, 2003 U.S. Dist. LEXIS 26838, at *17. At this stage, making all inferences in favor of Plaintiff, the Court finds that the allegations are sufficient to "stave off threshold dismissal for want of an adequate statement of [Plaintiff's] claim." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). Whether or not Plaintiff will be able to meet the extremely high standard for a claim of employment-related intentional infliction of emotional distress is an issue better suited for the merits stage of these proceedings. Accordingly, Defendant's motion to dismiss Plaintiff's IIED claim is denied.

### B.   Plaintiff's Claim for Promissory Estoppel

In Count Four of the Amended Complaint, Plaintiff brings a claim for promissory estoppel premised on YRC's anti-harassment policy (the "Policy"). Under the Policy, harassment is defined

as "unwelcome conduct, verbal, physical, or visual, based upon a person's race, color, religion, national origin, sex, age, disability, or other protected group status." *See* Policy, *located at* Warden Decl. Ex. B. The Policy states that YRC "will not tolerate harassing conduct that affects tangible job benefits, or interferes unreasonably with an employee's job performance, or creates an intimidating, hostile, or offensive workplace." *Id.* Plaintiff alleges that, pursuant to the terms of this Policy, YRC owed a duty to Plaintiff to protect him from harassment, job interference, and a hostile work environment, and Plaintiff relied on this promise to his detriment. *See* Am. Compl. ¶¶ 39–42.

Unlike Plaintiff's IIED claim, Plaintiff's promissory estoppel claim is preempted by the NJLAD. Even if the Court were to assume that the Policy created a promise that could be relied upon by Plaintiff, any breach of the Policy would stem from YRC or its agents "harassing" Plaintiff as defined by the Policy, and Plaintiff's claim would necessarily duplicate his claim under the NJLAD. Contrary to Plaintiff's assertion that the Policy covers any and all harassing conduct, the Policy clearly only applies to harassment that is "based upon a person's race, color, religion, national origin, sex, age, disability, or other protected group status." Consequently, in order to state a claim for promissory estoppel premised upon a breach of the Policy, Plaintiff would have to establish that he was harassed due to his protected status—i.e., his age. Any promissory estoppel claim based upon the harassment Plaintiff allegedly suffered from the workplace rumor that Plaintiff was a "rat" is not cognizable under the Policy because it does not fall into the definition of "harassment." Therefore, in order to prove that he detrimentally relied upon YRC's alleged promise in the Policy, he must establish the same conduct that underlies his NJLAD claim. Accordingly, any cognizable promissory estoppel claim based upon the Policy is duplicative of his NJLAD claim, and is preempted by the statute. *See, e.g., Dimare v. Metlife Ins. Co.*, No. 07-4268,

2008 U.S. Dist. LEXIS 43093, at *9 (D.N.J. May 30, 2008), aff'd, 369 F. App'x 324 (3d Cir. Mar. 4, 2010) ("[A] breach of contract claim that seeks damages for discriminatory acts on the basis of a statement in a policy manual is preempted by the [NJ]LAD").

## IV.   Conclusion

For the aforementioned reasons, Defendant's motion is granted in part and denied in part. An appropriate order accompanies this Opinion.

_____
PETER G. SHERIDAN, U.S.D.J.

Dated: June 9, 2015